A. N. KHOURI & BRO. *v.* UNITED STATES[1]

United States Customs Court, First Division

(Decided August 3, 1938)

*Brooks & Brooks* (*Ernest F. A. Place* of counsel) for the plaintiffs.
*Joseph R. Jackson,* Assistant Attorney General (*John Joseph McDermott,* special attorney), for the defendant.

Before McCLELLAND, SULLIVAN, and BROWN, Judges; BROWN, J., concurring

SULLIVAN, Judge: The subjects of these protests consist of eleven ornamental glass articles. The collector of customs at the port of New York classified them under paragraph 218 (f) of the Tariff Act of 1930, as "all articles of every description not specially provided for, composed wholly or in chief value of glass, blown * * * or colored, cut, engraved, etched * * * or decorated or ornamented in any manner," and assessed duty thereon as such at 60 per centum ad valorem.

They are claimed dutiable at 20 per centum ad valorem under paragraph 1547 of the same act as "Works of art, including * * * statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50."

The deposition of Rene Lalique, taken in response to a commission issued by this court, was received in evidence as Exhibit 1.

Mr. Lalique testified his business address is in Paris, France; that he is a "Master Glassmaker, Decorative Artist." He was questioned (interrogatory 5) as to whether he had personal knowledge of each and every step and process used to create the articles in

[1] C. D. 27.

question "which were shipped by Rene Lalique & Cie., of Paris, France, to A. N. Khouri & Bros., of New York, N. Y., U. S. A."

Then follows a list of the articles covered by these importations. Many items are listed besides those covered by Exhibits 2 to 12, inclusive, which are the only items in controversy. It is therefore unnecessary to set out this list.

He answered interrogatory 5 by saying, "Yes, of course, I have." The rest of his answer was stricken out by direction of the court.

On cross-examination he testified that the glass articles enumerated in this schedule or list "consist of glass vases, coupes, figurines, cendriers, and like articles composed of glass blown or partly blown in the mold or otherwise, colored, cut, engraved, etched, frosted, gilded, painted, stained or decorated or ornamented in any manner"; that "all of these articles are made of glass and have no connection whatever with porcelain."

As to the method of producing the articles enumerated he testified in substance that he personally designs the form, which is reproduced in plaster in his workshops; that he personally draws the ornamentation necessary to complete it, and designs "the manner in which the latter was to be interpreted"; that the sculpture of the different vases "has been hollowed out in the plaster form on which I had made my design," and the various phases of the work were continually under his supervision. As to other objects "after having indicated the design of the ornamentation, the latter has been modeled in wax on the originally plain form. After the necessary corrections, this work is molded in plaster before being finely retouched."

As to "Ornis" vases and "Motifs representing animals," etc., and "Statuettes of Christ," he stated: "The said motifs are treated entirely in wax according to my design. This malleable material enables me to make all desired modifications before the objects are molded in the plaster on which the additional details will afterwards be engraved." He further stated:

All these models, thus expressed in their form and in their detail, permit of making a counterpart which, in metallic alloys, constitutes a mold which can easily be chiselled.

The engravers who carry out this chiselling constantly submit their work to me and, in certain cases, the details are retouched in the metal itself.

\*        \*        \*        \*        \*        \*        \*

The metal mold thus obtained permits of casting, blowing, or pressing the liquid glass which is the substance of which these objects are finally made.

In order to obtain certain other motifs, such as does, reindeer, vases, etc., "the method adopted is the injection of the hot glass by means of an iron pusher adapted to a lever."

For other items "the glass is poured hot into a form, then the counterpart is slowly brought nearer and nearer until it presses down the glass to the point where it oozes out all around."

He further stated:

In other cases, the glassmaker prepares the glass by blowing and obtains the form and the ornamentation required by the impression in metal (so-called mold).

By these processes, by reason of the different thicknesses given by the reliefs or the fine parts of the ornamentation, the proofs do not give the appearance which the finished article must have; they are therefore sent to me to be re-processed under my direction by engraving on glass by means of wheels made of different materials, or by means of acids. They are then repolished in places in order to obtain different aspects. Then, finally, they are enamelled in various colors, again processed in the workshops in these different phases, and lastly baked again in an oven.

He closed his deposition by stating:

All the various work on these pieces is thus faithfully executed under my direction in order to bring about the realization of my idea.

This deposition indicates that the glass articles at bar were designed by Rene Lalique; that he first sketched his design; that from the sketch a plaster model was made; that this model was refined or modified by him, or by engravers under his direction, by chiseling, until it conformed to his desires; that from this model metal molds were made; and that the products from the molds were refined or finished either by Mr. Lalique himself or under his supervision, into the imported glass articles. Or, in other words, as stated in response to cross-interrogatory 16:

I have skilled workmen whom I direct in carrying out the actual manufacture but all the strictly artistic work is done by me.

In the oral testimony the plaintiffs produced several witnesses to establish that the merchandise in question was works of art.

The witness Khouri testified he is a member of the firm of A. N. Khouri & Bro. (the plaintiffs herein), and has been since 1919; that he personally bought these items. The witness proved samples of the merchandise in question, viz, items 826, 410, 1217, 1158, 1149, 1151, 1150, 1165, 1166, 1152, and 997. These items were received in evidence and marked as Exhibits 2 to 12, inclusive.

The witness testified he had been in the place of business of Rene Lalique in Paris frequently during the past five years, or as follows:

Once at least a year, or twice a year, for a period of three or four weeks at a time, and up to six weeks.

that he had seen Mr. Lalique at work, and his first step was "to make a pencil or chalk sketch, depending upon the size of the article that he is working on, or that he is thinking on." A specimen sketch made by Mr. Lalique was received in evidence as Illustrative Exhibit A. After making the sketch, the witness testified "generally a plaster model of the article that he has sketched" was made; next "a steel mold"; next molten glass is poured into the mold "and when the glass

is pressed it is taken out and then it is finished by a craftsman under the direction of Mr. Lalique."

On cross-examination he testified that "Mr. Lalique makes the first sketch of a thing, of every piece that is produced by him," or "rough sketches"; that "the rough sketches are turned over to the artisans, who refine the sketches subject to his approval"; that "when a sketch is completed and it is accepted by Lalique, then a plaster mass is made of that sketch and is brought to Lalique, and he personally traces the design or the object, on that particular mass of plaster, before he turns it over to one of the artisans or sculptors working under him, who traces the figures and the object and then submits it to Lalique for his approval. He improves upon it by chasing, engraving, or otherwise"; that the plaster model is sent to the mold department, where "there are certain artists and sculptors in steel who make the molds for Mr. Lalique, under his personal direction"; that articles like Exhibit 2 are pressed in a mold "by a physical process" by the use of a lever by a skilled glass worker, or "a craftsman in glass"; that the same is true of Exhibit 3, which he had seen manufactured as follows:

* * * the molten glass is poured into the mold; the mold is pressed by human power, and when the molten glass is cooled off by the process of water or otherwise it is taken out of the mold and sent to a firing kiln. When it is finished from the kiln then it is taken and finished by hand, polished, the edges worn off where the glass hasn't received the exact impression that is intended to be in the mold. Then it is worked by hand, either through stone wheels or steel wheels, or hand etching.

After it comes from the mold, he testified, it goes through "between 8 and 12 hands", who are "expert craftsmen in glass"; that Mr. Lalique "is present approximately once or twice a week when those operations are going through. When a new piece is to be produced Mr. Lalique is present to see it through"; that his testimony also applies to the other exhibits; that all of them were pressed in steel molds, which can be used to produce a number of the same articles.

The following was then brought out on cross-examination:

X Q. Do you know, are the molds in Mr. Lalique's factory made by mold makers—the steel molds—do you know of your own knowledge?—A. Yes, sir; they are.

X Q. So that after the steel mold is made there is no reason that would prevent at least a thousand or more replicas of Exhibit 12 being produced by the same mold; is that true? * * *—A. That doesn't apply to every piece. * * * From my knowledge it isn't reasonably possible to produce a thousand pieces from that same mold. * * * It is reasonable to expect the molten glass, or liquid glass poured into a mold will invariably wear out the sharp points of a mold and cause it to be a useless object for reproduction; and the mold has to be remade.

* * * * * * *

X Q. In that case the molder can make a new mold and still keep on producing?—A. He cannot make a new mold for Mr. Lalique without his going over the mold to see that it is absolutely perfect.

Presiding Judge McCLELLAND. How about the man that makes the mold? Is he an artisan?

The WITNESS. He is an artisan, sir.

\* \* \* \* \* \* \*

X Q. Of producing by a steel mold, and they can be reproduced up to the extent of eight or nine hundred, or a thousand replicas, depending on the wear and tear of the mold?—A. I wouldn't go as far as eight or nine hundred.

Presiding Judge McCLELLAND. One hundred would suit the purpose just as well.

The WITNESS. O. K.

A catalog of the glassware of Rene Lalique was received in evidence and marked "Illustrative Exhibit B."

The presiding judge asked the witness whether these molds are limited to the production of one of these articles, and the witness replied:

No, sir; there may be five or six, or as many as 24 of one particular item that are ready, but there is no larger quantity than that would be ready at any time.

Presiding Judge McCLELLAND. If you gave an order for a larger number you could have them made from the same mold?

The WITNESS. That is right.

The witness, referring to page 84 of Illustrative Exhibit B, testified that Exhibit 2 is depicted thereon. This represents a female figure in classical costume, surrounded and backed by an ornamental glass frame or backing. The figure is depicted blowing or playing on a double pipe or flute. It is numbered 826.

The witness testified that when Exhibit 2 is desired it is ordered "by item number as well as by name"; that "*outside of two pieces that exist today, and they happened to be in New York, no one could buy Exhibit 2. It would not be made*"; that if he wanted 50 reproductions of Exhibit 2 he could not procure them "because Mr. Lalique has decided to discontinue making the article Exhibit 2, he will not reproduce it again." On page 36 the witness was shown item 410, being an item like Exhibit 3. Of this article, he testified "we have sold a limited few," or "I dare say that we haven't sold more than 18 to 24." No. 410 is a round glass article resembling a highly ornamental plate.

On page 76, the witness testified, is depicted Exhibit 5. This is item 1158, and represents a glass fish on a pedestal. He testified he had sold "maybe a dozen" of this item in the United States.

The witness was referred to pages 75 and 93, and testified that Exhibit 6 is thereon pictured and described. This is No. 1149, and represents a bird on a pedestal. He testified he sold them in the United States, and had been ordering them since 1932 "and similar articles"; that during the past five years of article 6 "we have possibly imported 30 different times," one in each importation; that the same is true of Exhibit 7, depicted on page 93, item 1151, representing a bird, and the same testimony applies. As to Exhibit 8, item 1150,

depicted on pages 93 and 75, the witness testified he had sold in the United States "between 30 and 50." This exhibit also represents a bird. The same testimony applies to Exhibit 9, item 1165, depicted on pages 93 and 75, also a bird; also to Exhibit 10, item 1166, a bird. As to Exhibit 11, item 1142, the witness testified he had imported it about 15 times.

The witness then turned to page 20 of Exhibit B, and testified that Exhibit 12 is depicted thereon. This is item 997, a highly ornamental jar with nude female figures in high relief on the sides thereof, and entitled "Bacchantes." He testified he ordered this item both by number and by name, and that he has sold replicas thereof many times, or "Since my being an agent for Mr. Lalique I dare say that I have sold approximately between 40 and 75 pieces of that."

As to value the witness stated, "I concede that they are all over $2.50."

The witness Heaton, testifying on behalf of the plaintiffs, stated he is an artist, and that his courses of study were in Boston and New York City in general designing and free-hand drawing; that he has exhibited his work in the Metropolitan Museum, the Baltimore Museum, the Rochester Museum, the Montclair Museum, the Maryland Academy of Art, and the Paris Art Museum; that "the nature of those exhibits was both pieces of glass that were part of murals, and objects painted on glass." He then gave his experience in working in glass and stained glass.

He was referred to the Exhibits from 2 to 12, inclusive, separately, and as to each he testified that in his opinion it was a work of art.

He testified he would say Exhibit 3 was made by a skilled glass maker.

The witness Bittermann, testifying for the plaintiffs, stated he is an architect, and had studied free-hand drawing, life drawing, and modeling, included in the architectural course at Columbia University School of Architecture; that he has seen and examined Exhibits 2 to 12, inclusive, and that in his opinion each of those exhibits is a work of art, regardless of how produced, or who produced them.

Referring to Exhibit 8, he testified:

A skilled artisan could not design that piece. It is clearly the design of an artist. An artisan may execute the design of an artist but the artisan didn't design this. He (a skilled artisan or glass blower) couldn't design and prepare the original design. Immediately he could do that he is no longer a skilled artisan. He is an artist * * *.

On redirect examination he testified, "It is the common practice for sculptors to cast their sculptures more than once."

Recross-examination:

R. X Q. Supposing a work of Cellini's was reproduced, let us say a thousand times, where does the thousandth reproduction have the touch and genius of

Cellini?—A. From an artist's viewpoint if the thousandth copy and all those made up to that time are faithful copies of the original by Buenvenuto Cellini, they still remain as a great work of art. They may lack the value for the collector, but that doesn't change the fact that they are still a work of art. * * * In the case of a figure cast in bronze, cast by a founder, the artist's touch would remain the same after that founder had cast from the original three or four hundred times. The artist's touch is in the original, not in the casting, excepting as that casting was made from the original.

Presiding Judge McCLELLAND. Supposing a case where the original sketch was made by the artist, that every step from then on was by an artisan, would you say that that was a work of art?

The WITNESS. It would probably lack the quality that would make it a work of art. * * * It is easily conceivable that such a piece could be a piece of art. * * * If every step subsequent to the making of the sketch were done by an artisan? I don't think it could be a work of art. The artist's touch must find its inference somewhere in the finishing of the object.

Presiding Judge McCLELLAND. As to some of these, if not all of them, it has been testified this morning that they were produced two dozen at a time, and that the orders for several years had been filled. Would you still say that all of these were works of art?

The WITNESS. If they responded to the original they are still works of art.

Defendant's witness Silverman testified he is a "chemist and consultant on glass," is an instructor in chemistry in the University of Pittsburgh, and holds degrees of bachelor of philosophy, bachelor of arts, master of science "and two honorary degrees" from various universities; that he has been teaching in the chemistry department of the University of Pittsburgh for thirty-two years; that he has also lectured on glass, glassware, and the manufacture of glass, and has a private collection of over 600 pieces of glassware; that he has also "made various glasses in an experimental way in researches in the university, and also in the industry."

He was shown Exhibit 2, and described the process of its manufacture as follows:

The process by which an article of this type is prepared—Exhibit 2—is known as pressing. The design is carried in a mold, the glass is run into that mold, either from a ladle or from a gatherer, from a pipe or pontil, from which it is sheared when an adequate amount has flown in. Then the plunger of other pressure producing device is forced down, and the glass flows between the plunger and the outer portion of the mold. This outer portion may consist of two or more sections, usually hinged together, so that the mold will open and release the object, according to its particular design. After the pressing on the plunger the glass which is formed in the mold is permitted to cool sufficiently, that it may be removed without deforming, and then it is placed in an annealing oven, or lehrs, in which it is permitted to cool slowly, to remove strains. In the case of heavy objects it may be necessary to place them in a kiln to cool even more slowly. After the object has been annealed, if no serious defects are present it may be trimmed, so as to remove mold marks; in other words, ridges which have been caused by the bringing of the parts of the mold together, and in the form of fine, rough bits, rough and unsightly. These may be removed by grinding, and sharp edges may be removed. The edges in this particular case were un-

doubtedly ground and polished, and then the decorative process is applied, namely as on the relief portion, the front relief portion of this Exhibit 2, where an acid has been applied to produce a dull effect. The dull surface, that in brief is the procedure in the pressing of the glass article.

The witness was shown the other exhibits, and testified they were made in the same way as Exhibit 2.

He further testified:

Q. Doctor, from your experience in the study of glassware in the sphere of art I will ask you to look at Exhibit 2 and tell the court, if you can, whether or not in your opinion said exhibit is representative of a work of art.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The WITNESS. I think it is art; I think it is artistic; but these things are relatively art, and that is why I qualify it. I was going to ask whether all art has equal merit. In my opinion it does not.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Is Exhibit 2, in your opinion, in the category of industrial or decorative art?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

A. Yes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Would you please state what, in your opinion, is free fine art?—A. In my opinion free fine art is the creation for art's sake alone; in other words, a thing which is created for the love of the creation of the beautiful.

Q. Please define decorative art \* \* \*.—A. Decorative art I should define as that which adds ornamentation to an object.

Q. Exhibit 2; in which category would you place Exhibit 2; in decorative art or the free fine arts?—A. Decorative art. \* \* \* My reason for placing this in the category of decorative art is that it is produced for the purpose of creating an economic appeal. In other words, this figure wasn't created for the mere sake of creating a beautiful figure, but it was created for the purpose of making an object which would bring a monetary return. \* \* \* As I have stated, I consider these [Exhibits 2 to 12] examples of what I call commercial art.

The witness testified that Exhibits 2 to 12 are produced by a skilled artisan; but the design "is usually the work of an artist or a director of an art department," and therefore "is industrial art."

Defendant's witness Carder testified he is art director of the Corning Glassworks; that he has done work in sculpture and exhibited at the Royal Academy in London, and has served on the Hoover Art Commission at the Paris Exposition in 1925.

Referring to Exhibits 2 to 12, he testified:

I would classify all of the objects that I have seen here, which have been placed before your Honor, as decorative art—industrial decorative art. \* \* \* Simply because they are made for a set purpose, for a decorative scheme; and secondly they are made in quantity, to be sold for that purpose. \* \* \* It [Exhibit 2] was produced by pressing \* \* \*. By pressing the glass into a metal or steel mold.

He testified that Exhibit 2 has "merely decorative" value; that Exhibit 3 is in the category of "decorative art," not "free fine arts"; that the same is true of the other exhibits; that each of these exhibits is made by a mechanical process "in a steel or metal mold."

Defendant's witness Marshall testified he is a consulting engineer in the field of "glass and chemicals"; that he is a collector of glass art objects, and has been since 1919; that Exhibits 2 to 12, inclusive, "were made by a process which is known as pressing" as follows:

The pressing process involves placing within a mold a mass of molten glass, closing the mold so that the molten glass is forced into the cavities of the mold, and when the glass has just been set the mold is opened and the piece is removed. A glass mold, in order that these pieces may be taken out, must be made of parts which are hinged or pinned together; so that by examining pieces such as these— Exhibit 5—one can see where the parts of the mold were closed together, where they show a little fin which in parts has been polished off and in other parts still remains.

He testified that these molds "are produced by artisans and mechanics"; that the only limitation there would be to making "any number of replicas of Exhibits 2 to 12" "would be the wearing out of the mold"; that as to Exhibit 2 if the mold therefor were made of steel "probably around 500" replicas could be made; that as to these articles "the design must always be limited to shapes which permit the fabrication of a mold so that you can take a mold to pieces and take the pieces out, and can never have the form of a sculpture at all."

The witness testified he had seen designs such as these exhibits produced many times at two glass factories in England, and that in those factories—

The men who make the fundamental initial design are called art designers * * * and the men who translate the design into the finished mold, with or without the aid of the art designer, are artisan mold makers.

The witness compared the process of making these exhibits with that of casting bronze statuary or glass articles by the cere perdu or lost wax process. As to this method of casting he testified:

In the Cere perdu process the ceramic mold is finally broken away, so that there can be undercuts, and the original can be varied in any way, because the mold is broken away, and is not something that hinges itself out. * * * There can be no undercutting on a steel mold unless it be restricted to a very small piece that could be inserted in the side of the mold. Attempts have been made but usually without success. * * * When I examined them [Exhibits 2 to 12] I found no evidence of undercutting.

The witness testified that in the cere perdu process "the mold has to be destroyed," as the piece cannot be removed without doing so, and "in the cere perdu process the worker in glass can follow the artist's conception" thus permitting "more freedom of initiative" than in the mold process by which these articles were produced; that as "examples of replicas made by the pressing molding process they are quite good" and artistic; that "the pressing molding process" in glass cannot produce as artistic figures as the cere perdu process.

The plaintiffs then limited "the claims in the protests before the court to the items which are before the court in the several exhibits

enumerated upon the invoices, according to the item numbers and the names which appear in the testimony."

In rebuttal plaintiffs' witness Hoerger testified he is and has been for about eighteen years a designer in metal work, and is "a practical craftsman" in casting, forging, and repousse work; that he is familiar with casting in bronze by various processes, including the cere perdu process; that there is a process of molding with a false core of sand, which consists of a "separate print of sand which is placed in a mold to make it possible to remove an undercut pattern"; that if necessary he could make a thousand copies of Benvenuto Cellini's statue in bronze. Referring to metal molds he testified, "The mold, whether it is in reverse or in the round will produce in French sand molds an exact replica of the original mold"; that even in the cere perdu method of casting statuary the casting must be finished by cutting away various projections therefrom; that a metal to be cast must be alloyed "to make it flow better," or, in other words, he adapts his process to the technical difficulties he is confronted with.

On cross-examination he testified "that in order to obtain the object from the mold by the cere perdu method that the mold must be destroyed and torn away from the object"; that he had "never seen glass manufactured by the cere perdu process."

The testimony of witness Roth called in rebuttal by plaintiffs was held not competent.

The foregoing is a rather full review of the testimony, and indicates that Exhibits 2 to 12, inclusive, are designed and sketched by the artist Mr. Lalique; that the form is reproduced in plaster in his workshops by artisans; that Mr. Lalique personally draws the ornamentation on the plaster cast, which is then sculptured and additional details engraved thereon; that a metal mold is then made from the plaster cast by artisans; the glass object cast in this metal mold; and finally the glass article is finished "by a craftsman under the direction of Mr. Lalique." It was further shown that as many as 50 to 75 of some of these exhibits are made.

The plaintiffs in all of these protests originally claimed this merchandise dutiable at 20 per centum ad valorem under paragraph 1449 of the Tariff Act of 1930. Evidently that was erroneous, as paragraph 1449 is not contained in the Tariff Act of 1930. The initial protest 762077–G was filed in the customhouse in New York City on December 27, 1934, was held by the collector until June 4, 1935, and was first set for hearing by this court on the calendar of October 22, 1935. After two adjournments, on March 5, 1936, a motion to amend was filed in this court. On May 4, 1936, the court granted this motion, the Government not objecting. This motion to amend added the following claim to all the protests:

* * * and it is alternatively claimed that the merchandise is properly dutiable at 20% under the provisions of paragraph 1547, Tariff Act of 1930.

The plaintiffs contend that this merchandise is dutiable under paragraph 1547 as works of art.

The plaintiffs' contention is fully expressed in their brief as follows:

They are claimed to be dutiable at the rate of 20% ad valorem, under the provision numbered (2) in paragraph 1547, of the same act, which paragraph reads:

Par. 1547. (a) Works of art, including (1) paintings in oil or water colors, pastels, pen and ink drawings and copies, replicas, or reproductions of any of the same, (2) statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50, and (3) etchings and engravings, all the foregoing, not specially provided for, 20 per centum ad valorem.

It will be observed from the foregoing that not only paintings, pastels, pen and ink drawings, statuary and sculptures, but in addition, etchings and engravings are included under the first expression of the statute, namely "Works of art"; also "copies, replicas, or reproductions" of such paintings, etc., statuary and sculptures, are included under this designation. Copies, replicas, or reproductions of "etchings and engravings" are not mentioned. It would seem an anomaly if, as stated by one of the witnesses, by using a steel mold "probably around 500 replicas" of one of these articles could be made, to hold each one of these replicas a work of art. This merchandise is designed by an artist, many of these designs are beautiful and wonderfully executed, yet under the construction placed on the classification of works of art for tariff purposes by the courts, they could not be classified as such.

The Supreme Court of the United States, in very explicit and clear language, has defined the term "Works of art" as referred to in tariff acts, in *United States* v. *Perry*, 146 U. S. 71, wherein the court states:

For most practical purposes works of art may be divided into four classes: 1. The fine arts, properly so called, intended solely for ornamental purposes, and including paintings in oil and water, upon canvas, plaster, or other material, and original statuary of marble, stone, or bronze.

It is this class of merchandise that is considered works of art for tariff purposes, and during all tariff acts since this enunciation this rule has been followed in the administration thereof.

The court then continued as follows:

2. Minor objects of art, intended also for ornamental purposes, such as statuettes, vases, plaques, drawings, etchings, and the thousand and one articles which pass under the general name of bric-a-brac, and are susceptible of an indefinite reproduction from the original.

It would seem that the articles at bar would come under this heading.

Then the court refers to a third class as follows:

3. Objects of art, which serve primarily an ornamental, and incidentally a useful, purpose, such as painted or stained glass windows, tapestry, paper hangings, etc.

Finally, the court enumerates a fourth class as follows:

4. Objects primarily designed for a useful purpose, but made ornamental to please the eye and gratify the taste, such as ornamented clocks, the higher grade of carpets, curtains, gas-fixtures, and household and table furniture.

The court then states:

No special favor is extended by Congress to either of these classes except the first, which is alone recognized as belonging to the domain of high art. It seems entirely clear to us that in paragraph 757, Congress intended to distinguish between "pictorial paintings on glass" which subserve a purely ornamental purpose, and stained or painted glass windows which also subserve a useful purpose, and moved doubtless by a desire to encourage the new manufacture, determined to impose a duty of 45 per cent upon the latter, while the former were admitted free.

Therefore, in the case at bar the plaintiffs cannot recover unless this merchandise falls in the first class specified in the foregoing quotation, being works of art for art's sake, and not for mere ornamental and useful or decorative purposes "susceptible of an indefinite reproduction from the original."

The rule in the *Perry* case, *supra*, has been followed in this court and our appellate court on many occasions. The cases hereinafter referred to have included objects of beautiful design. In some cases they appeared to be masterpieces or replicas or copies thereof, yet they did not fall within the category of class one or works of art enumerated in the *Perry* case, *supra*.

In *United States* v. *Wanamaker*, 19 C. C. P. A. 229, T. D. 45336, reproductions of the "Queen Mathilda tapestries" in the Art Library at Bayeux, in Normandy, were produced "under the direction and supervision of an artist." The appellate court held them not to be reproductions of works of art under paragraph 1449 of the Tariff Act of 1922. The drawings were made by an artist and, from the drawings so made, the figures and designs were embroidered on linen bands spread on frames by three young ladies, professional painters and artists, under the supervision of the artist. The reproductions were held not to be works of art for the reason that there was "no evidence in the case at bar that the 'Queen Mathilda tapestries' were either produced by or under the direction and supervision of an artist." That case, therefore, is not entirely in point, but authorities cited therein are, viz, *United States* v. *Olivotti*, 7 Ct. Cust. Appls. 46, T. D. 36309; *Frei Art Glass Co.* v. *United States*, 15 id. 132, T. D. 42214; and *Friedlaender Co.* v. *United States*, 19 C. C. P. A. 198, T. D. 45295.

In the *Olivotti* case, *supra*, the court said:

* * * In our opinion, the expression "works of art" as used in paragraph 376 [Tariff Act of 1913] was not designed by Congress to cover the whole range of the beautiful and artistic but only those productions of the artist which are something more than ornamental or decorative and which may be properly ranged

as examples of the free fine arts, or possibly that class only of the free fine arts imitative of natural objects as the artist sees them, and appealing to the emotions through the eye alone. The potter, the *glassmaker*, the goldsmith, the weaver, the needlewoman, the lace maker, the woodworker, the jeweler, all produce things which are both artistic and beautiful. It can hardly be seriously contended, however, that it was the legislative purpose to include such things, beautiful and artistic though they may be, in a provision which, as shown by its history and the enumeration therein contained, was intended to favor that particular kind of art of which painting and sculpture are the types. * * * [Italics ours.]

In the *Frei Art Glass Co.* case, *supra*, the court said:

While it may seem incongruous to hold that things which are in fact works of art are not so in a tariff sense, the apparent reason therefor lies in the manifest intent of Congress to admit at a low rate of duty artistic works representative of the fine arts such as paintings and sculptures, *and at the same time to protect the American producers of such articles as belong to the decorative and industrial arts.* [Italics ours.]

In the *Friedlaender* case, *supra*, the articles were very elaborate statuettes, and exhibited every element of artistic work and value. They were composed of bronze or spelter. Their method of manufacture was similar to that of the articles at bar, the models therefor being the handiwork of artists; yet the merchandise was held not to be works of art. The court described their manufacture as follows:

* * * Originally a clay model is made by some sculptor or artist. From that a plaster reproduction is made, and from this reproduction, which is made in sections, a metal mold is made. If the figures are to be made of spelter the spelter is poured into these metal molds. If the figure is to be made of bronze, instead of a metal mold one is made from French sand, which has the property of being able to be packed closely about the clay model in such a way as to accurately portray every detail thereof. But one reproduction can be made from the sand molds, while the metal molds can be used indefinitely. When the molten metal is poured into the molds, these molds are whirled or manipulated so that the metal reaches every part of the interior of the mold. As the portion of the metal in contact with the mold hardens the interior molten metal is drawn off. The reproduction is then removed from the mold and finished. This finishing is done by chiselers or artisans and is not done under the direction of the original or any other artist or sculptor. From the time the original clay model is made all the work of reproducing these articles is done by artisans or workers in metal. When the article comes from the mold it is rough in places, and excess metal is found upon it which must be removed in order to give the article, when completed, a pleasing and finished effect. This work is done by the artisan, who finishes it according to his own individual ideas as to how the work should be done, his object, of course, being to follow, as nearly as he can, the original design.

Those articles could be reproduced by such methods more than 50 times.

It is established by the testimony at bar that some of these articles can be reproduced more than fifty times from the original molds. A large quantity of reproductions from molds could not be considered works of art under the authorities.

In the *Friedlaender* case, *supra*, the court cited the *Frei Art Glass* and *Olivotti* cases, *supra*, among other authorities, and held "To be works of art they must be such as come within the scope of our decisions, heretofore referred to."

In *Alexander & Oviatt* v. *United States*, T. D. 45639, 61 Treas. Dec. 950, certain molded glass articles were before us for classification purchased in Paris from Rene Lalique, said to be an artist creating original works of art in glass, who produced them as follows:

\* \* \* a mold is first made in plaster, from which a bronze cast is made; that the glass is poured into the bronze cast; and that "in this instance the bronze had to be destroyed to get the glass articles out."

It was held (Judge Cline writing the opinion):

We find from the evidence in these cases that the glass articles in controversy are works of art, but that they belong to that class known as the decorative and industrial arts rather than the free fine arts \* \* \*.

That case was affirmed by the appellate court in *Alexander & Oviatt* v. *United States*, 21 C. C. P. A. 97, T. D. 46410, and the appellate court quoted with approval the following excerpt from Judge Cline's opinion:

In construing the phrase "works of art," as used in .the various tariff acts, the United States Supreme Court and Court of Customs and Patent Appeals consistently have distinguished between works of art which belong to that class known as the free fine arts and those which properly are classified as decorative or industrial arts, and have held that the privileges extended by the tariff acts have been limited to the former class.   [Citing cases.]

See also *United States* v. *Columbo Co.*, 21 id. 177, T. D. 46510, involving a colored glass mosaic, purporting to be a copy of the painting "Disputa", painted upon the walls of one of the chapels of the Vatican at Rome by Raphael, which was held—

not *a work of art* for tariff purposes, although it is a representation of a painting in oil, concededly a work of the free fine arts, and is itself a work of art, in fact, being designed, produced, and installed by and under the supervision of one or more professional artists.

There would be a much stronger reason for holding the mosaic in that case a work of art than there is for holding the glass ornaments at bar such.

It seems to us the one test governing classification of articles as works of art is whether or not they are works of the free fine arts as distinguished from decorative and industrial arts.   We are of opinion that the glass articles at bar are not in the class of free fine art but belong to the class of decorative and industrial arts.

In thus holding we are not unmindful of the fact that in *Alexander & Oviatt* v. *United States*, T. D. 47343, 66 Treas. Dec. 501, we held certain glass ornaments, being the original works of a noted French

sculptor in glass (Rene Lalique), and representations of the free fine arts produced by the lost wax process, dutiable as "works of art * * * sculptures" under the Tariff Act of 1922. In that case, however, three witnesses testified to the effect that such glass ornaments were works of art, and one witness went further and gave it as his opinion as a sculptor that they were works of the free fine arts. Their testimony was not disputed by the Government *who did not introduce any witnesses*, and was ample to overcome the presumption of correctness attaching to the action of the collector.

The protests are overruled. Judgment for defendant.

BROWN, Judge: I concur in the conclusion reached.