(C. D. 1277)

WM. S. PITCAIRN CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided October 5, 1950)

*Benjamin A. Levett* (*Meyer Ohlbaum* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Richard E. FitzGibbon* and *Harold L. Grossman,* special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

CLINE, Judge: This is a protest, arising at the port of New York, against the collector's assessment of duty on china and earthenware figurines, at 45 per centum ad valorem under paragraph 212 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, T.D. 49753, on those made of china, and at 50 per centum ad valorem and 10 cents per dozen pieces under paragraph 211 on those made of earthenware. It is claimed that the articles are properly dutiable at 20 per centum ad valorem under paragraph 1547 (a) as "Works of art * * * statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50." The claim is limited to those articles shown by the appraiser's return to be of a value of $2.50 or more each. All other claims in the protest have been abandoned.

The court expresses appreciation of the excellent briefs supplied by counsel for both parties.

The pertinent provisions of the tariff act are as follows:

PAR. 211.   Earthenware and crockery ware composed of a nonvitrified absorbent body, including white granite and semiporcelain earthenware, and cream-colored ware, terra cotta, and stoneware, including * * * statues, statuettes; * * * and all other articles composed wholly or in chief value of such ware; * * * painted, colored, tinted, stained, enameled, gilded, printed, ornamented, or decorated in any manner, and manufactures in chief value of such ware, not specially provided for, 10 cents per dozen pieces and 50 per centum ad valorem.

PAR. 212 [as modified by the trade agreement with the United Kingdom, T. D. 49753].   China, porcelain, and other vitrified wares, including chemical porcelain ware, composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture, and all bisque and parian wares, including * * * statues, statuettes, * * * and all other articles composed wholly or in chief value of such ware (except sanitary ware and parts and fittings therefor); any of the foregoing containing 25 per centum or more of calcined bone:

    *        *        *        *        *        *        *

Painted, colored, tinted, stained, enameled, gilded, printed, or ornamented or decorated in any manner, and manufactures in chief value of such ware, not specially provided for:

    *        *        *        *        *        *        *

Other_____ 45% ad val.

PAR. 1547.   (a)   Works of art, including (1)   paintings in oil or water colors, pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same, (2)   statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50, and (3)   etchings and engravings, all the foregoing, not specially provided for, 20 per centum ad valorem.

At the trial 18 samples of the merchandise were received in evidence (plaintiff's exhibits 1 to 18).   It was stipulated that such articles—

* * * are true samples of, and respectively represent in all respects, all figures wherever so described or designated on the invoices accompanying the entries covered by the above numbered protest and may be received in evidence as such samples and marked respectively as plaintiff's exhibits 1 to 18.

It is further stipulated and agreed that such samples may be so received as representative as to character, material, process of manufacture, and identical in other respects, except as to size, value, design and subject matter, of all figures covered by the above numbered protest and described or designated on the invoices accompanying said protest as "figures", irrespective of any particular name and number under which such figures may be designated on said invoices.

There were received in evidence the deposition of Leslie Harradine (plaintiff's exhibit 20), the deposition of Frederick Thomas Daws (plaintiff's exhibit 21), and the depositions of Cecil J. Noke and of the individuals who painted the figures before the court (plaintiff's exhibit 22).

Cecil J. Noke stated in his deposition that he is the art director of Doulton & Co., Limited (hereinafter called Doulton), and has held

that position for 12 years; that Doulton produces bone china and earthenware figures, tableware, vases, and decorative lines; that he is responsible for the production and designing of all patterns for such articles; that he is responsible for all new models, both figures and animals, for the coloring, and for all details attached thereto; that he was trained through schools of art which he attended while in the employ of Doulton; that he is familiar with all the processes by which the figures involved herein were produced at the factory; that he is responsible for the designing, making, and coloring of all figures produced by Doulton. He described the process by which the figures are made as follows:

The designs are originated by the artist-designer on paper or in clay—according to his individual method of working—a working model is prepared in plastic clay.

From the working model a set of master moulds is made in plaster of Paris. One mould does not suffice, of course, for a complete figure; it would be impossible to remove it. The figure has to be cut up in a number of separate pieces, for each of which a separate mould is made. Each dissected part of the model must fit perfectly when the various pieces are finally assembled. Each mould is used only a limited number of times and is then replaced—one reason why all Doulton figures are indistinguishable in exactitude of detail from the original model. Subsequent copies of the model are made by a process known as slip-casting. A liquid mixture of specially prepared clays and other ingredients is poured into each separate mould.

The porous plaster absorbs the water and the inner surfaces of the moulds gradually become lined with a coating of "set clay." The filling of the moulds is done by figure-makers, each one a seasoned veteran at his or her job, knowing just how long the "slip" (or liquid clay) should be left in the moulds in order that the casting may have the right thickness and strength. At the proper time, the superfluous liquid is poured away and—after an interval for drying—the moulds are opened up and the various pieces are carefully removed and trimmed. They are then fitted together into a complete model, a process demanding great precision and delicacy of touch.

 &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Flower-making is a specialised branch of work which invariably fascinates visitors to our Burslem unit. Each flower is made separately by hand. A roll of clay is thinly spread on the hand and from this the petals, stalks and other parts of the flower are deftly shaped and built up into the form of a flower.

After having been assembled and finished in the clay state, the figure is slowly dried to remove surplus water before the first major firing. Is is then placed with others in a fireclay container which in turn is placed in a pottery oven, in which it is fired or "baked" at a temperature far beyond the melting point of most metals. This firing changes the clay into a pure white body known as "biscuit china." The firing temperature at various stages has to be most accurately controlled—if the heat were one or two degrees too intense the figures would be distorted or destroyed; yet it is only by approaching the danger-point that the translucent beauty of the figure can be achieved.

Each figure before going into the oven must be secured by a number of props to prevent projecting parts from falling out of shape. During firing each figure shrinks considerably in size and this factor has, of course, to be taken into account when forming the master moulds.

After this first firing the figure has a matt surface. It is dipped into a specially prepared glaze and then receives its second hard firing in what is known as a "glost" oven. The glaze coating fuses during this process and becomes virtually a thin coating of glass, giving a beautiful but not excessive sheen to the ware.

From this stage onwards, the artists decorate the white translucent figure. Without exception, every Royal Doulton figure is coloured by hand. The colours are not ordinary paint; they are special ceramic colours evolved, for the most part, from metal bases.   *   *   *

\*         \*         \*         \*         \*         \*         \*

The creation of a new figure model may take as long as four months—that is, from the time the original working model is approved to the final firing of the completed figure.

Mr. Noke stated further that the painting of the figures is done by artists who have been trained in this branch of work; that only artists who have had art school training or who have been trained in the Doulton training school are employed; that the painting of a particular figure is carried out entirely by the artist to whom it is assigned, except that the painting of facial details may be done by specialists; that each artist is responsible for the perfect completion of the figure from start to finish; that before each fire, the figure is examined by experts for any signs of imperfection; that the originators of the original models of the exhibits before the court are: Charles J. Noke, Fred. T. Daws, and Leslie Harradine; that they work from instructions given by the witness and follow his ideas before submitting the models for inspection; that Charles J. Noke, father of the witness, commenced work as a modeler at Worcester in 1874 and joined Doulton in 1890; that his modeling for the Chicago Exhibition in 1893 received high awards, and he received many medals at International Exhibitions, including Brussels, Turin, and Paris; that he modeled portraits of well-known people, including Sir Edward Elgar and Mr. Rupert Kettle, K. C.

The witness stated further that the modeling and painting of figures is always done by individuals who have had special art training and that the making of the molds is undertaken by men who are specially trained for that work; that with the exception of the mechanical process of firing, none of the work in producing the figures is done by artisans or mechanical means; that the figures have no utilitarian purposes; that each figure, although of the same design and character, is individually made; that they are produced from a mold, made from the original model, but every process after the figure leaves the mold is done by hand.

Leslie Harradine stated in his deposition that he is a sculptor and has been engaged for the last 35 years in the production of portrait busts, figures, and reliefs; that he studied at the Camberwell School of Art, London, under Albert Toft, a well-known British sculptor; that he has not sent his work to exhibitions but has sold his work privately; that he did exhibit some of his work at the International

Exhibition of Modern Art in Paris in 1925 and was awarded a silver medal; that he has modeled and designed statuettes for Doulton for more than 30 years; that he modeled the following figures for Doulton which are involved herein:

| | | | |
|---|---|---|---|
| Little Bridesmaid No. | 1433 | Dorcas | No. 1558 |
| Rose | 1368 | Lydia | 1908 |
| Sweet and Twenty | 1298 | Miss Demure | 1402 |
| Autumn Breezes | 1913 | Paisley Shawl | 1392 |
| Chloe | 1765 | | |

Mr. Harradine stated that in producing the models he follows suggestions made by Doulton; that Doulton may suggest a character, send a sketch, or an illustration to indicate an idea; that he follows "any ideas as to a suitable representation of the ideas suggested and visualise an idea, seeing it clearly I proceed to create it in clay, modelling from life or imagination"; that the clay model is sent to Doulton with any ideas for coloring and special points to be followed when producing the finished figures. He stated that he never worked for Doulton as an employee but did his work at his own studio; that he has executed commissions for private individuals in various media; that he considers the figures involved herein to be works of art since each is the conception and creation of an artist; that every detail from the modeling in clay to the finished model including the decorative ideas are his work as a professional sculptor and artist.

In answer to cross-interrogatories, Mr. Harradine stated that he designs and models the original clay model for each subject for Doulton; that there is one original of each subject; that he has nothing to do with the process of molding and casting; that he did not know how many molds were made from his originals or how many castings were made from each mold; that he did not paint the decorative effect or design on the figures; that he does not personally supervise the painting of the replicas and does not know the persons who do the painting.

Frederick Thomas Daws stated in his deposition that he is an artist and sculptor specializing in the painting and modeling of dogs and other animals; that he studied at the Lambeth School of Art in London and is a life-long student of animal life at the Zoological Society of London; that he has exhibited pictures and models at the Royal Academy of Arts in London, the Salon of Paris, the Walker Art Gallery, Liverpool, the Bristol Academy, and the Royal Society of British Artists, London; that he has produced models of dogs and other animals for Doulton since 1930 or 1931, many from life, some from ideas of his own, and some from suggestions by Doulton; that he modeled the following figures involved herein:

| | | | |
|---|---|---|---|
| English Setter and Pheasant No. | 2529 | Cocker Spaniel | No. 1078 |
| English Setter | 1051 | Cocker Spaniel | 1036 |
| Rough Haired Terrier | 1014 | Cocker Spaniel | 1037 |
| Cocker and Pheasant | 1029 | Irish Setter | 1056 |

The witness stated that each of the above was modeled in clay or wax and then cast in plaster; that two of the plaster models were delivered to Doulton, one in full color as it was to appear when produced in china, to serve as a guide for the artist employed by Doulton when working on the china model, the second copy remaining unpainted from which to make molds for production in pottery. The witness stated that he has never worked as an employee of Doulton but has his own studio; that he has done work for rendering in pottery for no other firm; that the figures are works of art since they are the inception of a professional sculptor and every detail from the modeling to the finished original is his work as a professional artist.

In answer to cross-interrogatories, Mr. Daws stated that in each case he made one original model only in clay or wax; that he personally created the decorative effect or design for each figure; that he personally painted each original; that he had nothing to do with the preparation of the molds; that he had nothing to do with the casting of the original figures except "to the extent of removing seams from the cast made from sections of moulding and finally touching up generally"; that he did not know how many molds were made from each original nor how many castings were made from the original mold; that he did not paint the decorative effect on each copy, reproduction, or replica of the figures, and he did not know the individuals who did; that he did not supervise the painting of the copies, reproductions, or replicas of the figures.

A set of questions was propounded to each of the individuals who painted the figures and their answers were substantially as follows: That they were artists or figure artists employed by Doulton from 2½ to 22 years; that they were trained at schools of art in the correct mixing and application of ceramic colors and the effects that firing has on them; that they have no other occupation than painting figures for Doulton; that the men painted the complete figure and the women painted all of the figure except the face; that they had nothing to do with the casting of the figures and did not know how many castings were made; that they received the figures from the foremen of their respective shops; that they received instructions from them as to coloring the figure to match the pattern given as a guide; that the figure as delivered to them did not embody their professional or personal skill; that the artistic conception did not originate with them; that they did not know who created the figures; that they knew who created the color scheme for the figure; that the person who created the original [apparently meaning the original color scheme] supervised their work; that he gave them instructions as to what colors to be applied and where to apply them to get the effect required; that they had had training in painting in art school; that all but two were employed by Doulton or other pottery firms while attend-

ing school; that with the exception of four, none had had any public exhibitions or showings of paintings, and of said four, one had exhibited one painting, and the others had exhibited several; that only three had sold any paintings; that it took them from 1 to 5 hours to paint one figure; that they painted from two to eight figures per day.

Plaintiff called three witnesses at the trial: Wheeler Williams and Nathaniel Choate, scupltors, and John M. Graham, curator in the Brooklyn Museum of Decorative Arts.

Mr. Williams summarized his education and qualifications as a sculptor, stating that he had done a great deal of work with ceramic sculptures. He testified that the requisite for bringing ceramic sculptures within the domain of the fine arts is the intent of the artist. He then described the method of making porcelain sculptures and stated that it was impossible for the artist to perform each step of the process but that the finished articles are works of art created by the artist; that when he himself created ceramic sculptures, he checked the work of the molders and casters from time to time; that he threw away many figures because they were warped in the firing; that eight of each figure were made before a satisfactory one was produced. He stated that, assuming exhibits 1 to 18 were produced by substantially the same process he described, they were works of fine art; that "you can't eat them or use them or do anything but derive satisfaction or pleasure from them."

On cross-examination the witness stated that the exhibits were works of art because they conveyed beauty in the sense the artist meant them to; that a work of art should be a sincere attempt to express in three-dimensional rhythmic forms an emotion or an aspect of life; that the artist hopes to share and communicate his ideas, reactions, and feelings with others.

Plaintiff's second witness, Nathaniel Choate, outlined his training and experience as a sculptor and painter and stated that he had produced ceramic sculptures; that all sculptures come within the domain of the fine arts; that in his opinion the exhibits herein are works of art because they are decorative and are designed for their beauty and their aesthetic appeal.

Mr. Graham stated that he has always been especially interested in ceramics; that he has built up a large collection of American ceramics at the Museum; that they have had sculptures of the ceramic arts that he considers works of the fine arts; that such a piece would be the creation of an artist's imagination without relation to use; that the exhibits herein are works of art; that—

I see no difference between those figures and figures that have been produced in the past which you accept in every great collection and which are shown in all museums throughout the world; that I also don't see any difference in the method of production and the conception of the figures of things that we recently have shown from other contemporary people.

Defendant called Alex J. Ettl, a sculptor for 36 years, whose qualifications were conceded by plaintiff's counsel. He stated that his experience in ceramic arts has been in making molds; that the firm of which he is a partner has made molds for other sculptors; that he has made models which have been molded and resulted in ceramic works of fine arts.

The witness was shown plaintiff's exhibit 1 and was asked a hypothetical question predicated upon the record, and in response thereto he stated that the figure was not a work of art. He was asked a similar question and gave the same answer in regard to plaintiff's exhibits 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18. He testified that they were not works of art because, in his opinion, the originals were not works of art; that it was not conceivable that the actual production of the piece and the finishing of it in all its detail could be done by several outside workers and still remain the original creation of the sculptor who created the original; that the sculptors who created the originals were not producing works that would satisfy their feelings, emotions, and opinions, but were designing sculpture to satisfy a mass buying market; that the sculptor in no way participated or inspected or finished the figures; that he allowed other hands to remove the mold seams, correct the distortions that take place in the shrinkage, and in no way put into it the personal qualities that works of art must have; that in the production of a piece of fine art, the sculptor makes a limited edition of from 10 to 20 or possibly 200 pieces; that he works over each piece that comes out of the mold. He stated also that works of art are not made in large quantities in factories or commercial establishments.

Felix Wildenstein, called as a witness by the defendant, testified that he has been a dealer in paintings and works of art for 48 years and that his firm handles high-class paintings, tapestries, and occasionally sculpture; that they have handled della Robbia majolica; that in his opinion the exhibits herein are not works of art; that he did not consider as a work of art anything that has not been conceived by the originator; that no great sculptor would allow anything to be done without his supervision.

William Zorach, called as a witness by the defendant, testified that he has been a sculptor and painter for 40 years, and his qualifications were conceded by plaintiff's counsel. He was shown the exhibits herein and was asked hypothetical questions predicated upon the record. He stated that plaintiff's exhibits 1, 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18 were not works of art because they were made in large quantities and glazed and fired by artisans; that they could have been works of art only if the sculptor had modeled each individual piece, cast it, fired it, and glazed it with his own hands so that each piece would have variations; that an object is not a work

of art unless it has art content; that when an artist works with the thought of selling a thing commercially, that thing loses any quality of art content in large production.

He stated also that works of art are not made in large quantities in factories or commercial establishments; that works of art are made only in limited editions to the number of 10 or 12, and the making is supervised by the artist himself; that where suggestions for figures are made by Doulton, the objects are not works of art; that if the artist is great enough, he can produce a work of art from a suggested subject, but that in the highest form, a work of art is the creation of the artist himself without any outside suggestion; that a work of art is done by the artist himself from beginning to end; that where a sculptor prepares a model for reproduction in porcelain for commercial purposes, the original model is a work of art, but the reproductions are not.

Defendant called Edwin Pearson, who testified that he has been a sculptor since 1923 and is still actively engaged in the profession. He was shown the exhibits and asked hypothetical questions predicated upon the record. He stated that the exhibits were not works of art because they were made for commercial purposes; that a work of art can exist once; that a reproduction is not a work of art; that a work of art is an activity, physical, spiritual, and mental activity from the time the sculptor starts to the time when the impulses cease; that beyond that, any reproductions or copies may carry the message but they cannot be original works of art; that the original models herein were not works of art because the artist is the Doulton Co.; that the sculptor and the artisans are a part of an assembly line.

William W. Hunter, china and glass buyer of Plummer, Ltd., called as a witness by the defendant, testified that Plummer, Ltd., carried Doulton figures, such as plaintiff's exhibits 1 to 18; that he is in charge of the buying and selling of such figures; that he did not recall that any of the literature received from Doulton ever referred to the figures as works of art; that he never calls them works of art; that they keep at least six of each figure in stock.

Paragraph 1547 (a) of the Tariff Act of 1930 provides that duty shall be assessed at 20 per centum ad valorem on works of art including statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50. Under paragraph 1807, free entry is provided for original sculptures or statuary, including not more than two replicas or reproductions of the same. Said paragraph provides further:

* * * the terms "sculpture" and "statuary" as used in this paragraph shall be understood to include professional productions of sculptors only, whether in round or in relief, in bronze, marble, stone, terra cotta, ivory, wood, or metal, or whether cut, carved, or otherwise wrought by hand from the solid block or

mass of marble, stone, or alabaster, or from metal, or cast in bronze or other metal or substance, or from wax or plaster, made as the professional productions of sculptors only; and the words "painting," "drawing," "sketch," "sculpture," and "statuary" as used in this paragraph shall not be understood to include any articles of utility or for industrial use, nor such as are made wholly or in part by stenciling or any other mechanical process; * * *

Paragraphs 1547 and 1807 and their predecessors in prior tariff acts have been construed together by the courts. It is well settled that in order to bring an article within paragraph 1547 (a) (2), it must be a professional production of sculptors only in accordance with the definition in paragraph 1807. *Stern* v. *United States*, 3 Ct. Cust. Appls. 124, T. D. 32381; *Consmiller* v. *United States*, 3 Ct. Cust. Appls. 298, T. D. 32585; *United States* v. *Downing & Co.*, 6 Ct. Cust. Appls. 545, T. D. 36197. Statuary and sculpture must be works of the fine arts in order to be free under paragraph 1807 or dutiable under paragraph 1547. *O. O. Friedlaender Co.* v. *United States*, 19 C. C. P. A. 198, T. D. 45295.

Under the definition set forth in paragraph 1807, *supra*, "sculptures" must be the professional production of sculptors only and may not include articles of utility or such as are made wholly or in part by stenciling or any other mechanical process.

It has been held that a sculptor is one who is wholly or in part engaged in the practice of the profession and who possesses artistic conception, taste, sense, and skill, together with the ability to reproduce or present the same to the beholder or see that others do it for him. *United States* v. *Downing & Co., supra*. The sculptor must be more than a skilled artisan; he must reproduce that which is pictured in his imagination, and his production must appeal not only to the eye but to the emotions as well; he must create and originate. *Consmiller* v. *United States, supra*. In the leading case of *Merritt* v. *Tiffany*, 132 U. S. 167, the court said (p. 169):

* * * What productions are to be deemed professional productions of a statuary or a sculptor it is difficult to state in general terms, so as to embrace every article of the kind. It is sufficiently accurate, however, for this case, to say that the definition embraces such works of art as are the result of the artist's own creation, or are copies of them, made under his direction and supervision, or copies of works of other artists, made under the like direction and supervision, as distinguished from the productions of the manufacturer or mechanic.

In the instant case the original models were made by Messrs. Daws, Harradine, and Noke. Messrs. Daws and Harradine had studied art, maintained their own studios, and were actively engaged as professional sculptors. Mr. Noke had worked as a modeler with Doulton and had received high awards and medals for his work at various exhibitions.

In spite of the fact that Messrs. Daws and Harradine, at least, were professional sculptors, defendant claims that the original models

were not works of art because they were not made as the professional productions of sculptors. This contention is made, first, on the ground that suggestions for the figures and sometimes sketches and illustrations were sent to the sculptors by Cecil J. Noke, art director for Doulton. There is no evidence that Mr. Noke or anyone else from Doulton had anything to do with making the actual models. Although suggestions for subjects were made, the sculptor carried out his own ideas in the designing of the figures. In *Baldwin Shipping Co.* v. *United States*, 12 Ct. Cust. Appls. 128, T. D. 40051, three statues were made from photographs. Before making them up in marble, the clay models were sent to the purchasers for inspection and in one case a change was suggested and made. The court held that the statues were original works of art even though produced from a photograph, since the artist's professional skill, artistic imagination, and conception were called into play.

In *Pitt & Scott* v. *United States*, 18 C. C. P. A. 326, T. D. 44584, paintings were made to illustrate stories. While they were held not to be works of art because created for a utilitarian purpose as one of the steps in the production of a magazine, the court said (pp. 327–328):

The Government, in the court below, tried the case apparently upon the theory that since the paintings were made pursuant to certain instructions, they were not original conceptions of the artist and were, therefore, not original paintings within the meaning of paragraph 1704. * * *

The court below held the articles to be original paintings in oil, but followed its decision in Abstract 42491 and held that the importation consisted of articles of utility and denied it classification under paragraph 1704. In the opinion the court below, after stating the Government's position that the paintings were not original, aptly said:

A portrait is no less original because the artist has the subject before him and is guided by it. Nor is a landscape lacking in originality because painted from nature. That the artist is obliged to follow the author's general description of a character does not prevent the painting from being the original conception of the artist of a character with those general characteristics. It has been said and is generally accepted, we think, that no two people see the same thing in exactly the same way. Certainly, then, a fictitious person or persons would not appear to two people in exactly the same way. We think upon the record that the plaintiffs have proved the originality of the paintings.

We think the foregoing is a correct statement of the law. * * *

Defendant's witness, Zorach, while maintaining that, in the highest form, a work of art is the creation of the artist without any outside suggestion, stated that an artist may produce a work of art on a suggested subject.

Defendant's second ground for claiming that the original models were not works of art is that the sculptors had nothing to do with processing the porcelain figures. Making models in clay or wax for

subsequent casting is the accepted method by which sculptures in bronze and porcelain are made. A part of this process is necessarily mechanical and is not done by the artist himself. Nevertheless, the finished product is considered to be the original work of art made by the sculptor. *United States* v. *F. G. R. Roth,* 22 C. C. P. A. 293, T. D. 47347; *United States* v. *Olivotti,* 7 Ct. Cust. Appls. 46, T. D. 36309.

In the course of his testimony, the sculptor, Williams, described the process by which a ceramic sculpture—for which he received a gold medal from the International Exposition in Paris in 1937—was made. He stated that after the mold was made, he turned it over to a ceramic engineer as he is not able to design glazes which will shrink in unison with the slip of the porcelain body; that in connection with the painting, he made a water-color picture of what he wanted; that he could not have painted the porcelain himself because he is not technically trained for that; that it would be impossible for a sculptor to perform all the processes himself.

In *United States* v. *F. G. R. Roth, supra,* the sculptor made clay models which were then cast in plaster of paris. These articles were afterwards taken to England and molds were made at the Doulton factory. He retouched the molds where necessary and selected the colors for glazing. The finished articles were held to be original sculptures and replicas thereof. The court said (p. 297):

We are of the opinion that the fact that appellee did not personally make the molds, or do the baking or the glazing, is immaterial, for these operations were merely for the purpose of placing in an enduring form the conception of the sculptor fully developed in the models from which the figures were cast. The art exercised by appellee was the art defined in the *Olivotti* case as sculpture, all of the figures here involved being representations "of natural objects, * * * in their true proportions of length, breadth, and thickness, or of length and breadth only."

In *United States* v. *Olivotti, supra,* the court said (p. 48):

* * * Sculpture as an art is that branch of the free fine arts which chisels or carves out of stone or other solid material or models in clay or other plastic substance for subsequent reproduction by carving or casting, imitations of natural objects, chiefly the human form, and represents such objects in their true proportions of length, breadth, and thickness, or of length and breadth only.

Therefore, an object may be a work of art even though the sculptor does not do all the work of molding and casting. In the instant case, moreover, the sculptor, Frederick Daws, stated that he removed the seams from the molds and touched them up generally, and he painted one of the plaster models in the colors he desired, to serve as a guide for the artist who painted the porcelain article. He appears to have done all that a sculptor ordinarily does in producing ceramic sculptures. As stated by the witness, Williams, the work of molding, casting, and painting on porcelain has to be done by experts specially

trained for that work. The sculptor, Leslie Harradine, stated that when he sent the clay models to Doulton, he also gave them instructions to be followed in producing and coloring the figure.

We conclude, therefore, that the original reproductions in porcelain of the clay models made by the sculptors were works of art.

The objects before the court, however, are not the original reproductions of the clay models but are reproductions made later. The question is whether they fall into the category of copies, replicas, or reproductions of works of art. There is no evidence that professional sculptors supervised the making of these reproductions. Mr. Noke stated that the molds were replaced by new ones from time to time, but the record does not show that these replacements were ever checked by sculptors. Whether or not the articles herein were made from the original molds is not indicated. Mr. Noke stated also that flowers for the figures are made separately by hand and not from molds, but there is nothing to establish whether this was done by or under the supervision of sculptors. .

In *United States* v. *Downing & Co., supra,* the court discussed the works of arts paragraphs in the Tariff Acts of 1909 and 1913 and stated (p. 551):

The fact that paragraph 470 limited sculptures to the professional productions of sculptors only, a limitation not found in paragraph 376, as already noted, does not, as we view the matter lower the standard or quality of work required to constitute a sculpture within the meaning of the latter paragraph. In the common acceptation of the term, a work to be entitled to the characterization of sculpture must be the production of a professional sculptor. It must be a work that embodies professional skill, taste, touch, and artistic conception, appealing not only to the eye but the emotions as well, and although "sculptures" may include under the statute copies of recognized works of that art, yet *such copies must possess the same qualities or characteristics, and whether an original or a copy, must be made either by or under the supervision of a professional sculptor.* It is unbelievable that a sculpture in the common understanding can be produced by one who has neither embraced that profession nor has artistic skill, taste, touch, or ability in exercising it. [Emphasis supplied.]

In *J. Thannhauser* v. *United States,* 14 Cust. Ct. 62, C. D. 912, certain sculptures in wax were found in the studio of the sculptor, Degas, after his death, and his heirs had the figures cast in bronze by a founder. The court held that the bronze articles were neither originals nor replicas nor reproductions of sculptures, since they were not shown to have been cast by an artist or sculptor or by an assistant under the sculptor's supervision.

Plaintiff relies upon *Royal Copenhagen Porcelain Co.* v. *United States,* 63 Treas. Dec. 1443, Abstract 23709. That case involved porcelain figures and vases made by Royal Copenhagen Porcelain, Inc., in Denmark, by a method similar to that used to produce the articles herein. It was held that the articles which were exhibited to the court were reproductions of original works of art produced by

professional artists and sculptors. In the course of the decision, the court made the following statement (p. 1446):

On cross-examination this witness testified that the man who made the original sculpture did not do any of the work on the reproductions, but that the persons in the employ of the Royal Copenhagen shop who did this work and who were referred to by Government counsel as skilled artisans, are in fact "skilled sculptors"; that the vases are painted by artists who have had several years' training at the Royal Academy and have passed their examinations there as artists, and that no painters are employed by the company unless they can show artistic work produced by themselves.

In that case the court found the persons who made the reproductions to be sculptors, while in the instant case there is no evidence that the reproductions were made by other than artisans. Moreover, in the *Royal Copenhagen* case, the persons who painted the figures had been trained at the Royal Academy, had passed examinations, and had shown artistic work produced by themselves. In the instant case, the pottery artists had received some art school education and on-the-job training at the Doulton factory. Most of them had not produced any artistic work themselves. The *Royal Copenhagen* decision is, therefore, not controlling in the instant case.

The intent of Congress in limiting the entry at a low rate of duty to certain artistic productions was to encourage the importation of works of the free fine arts and at the same time to protect American producers of articles belonging to the decorative and industrial arts. *Tutton* v. *Viti*, 108 U. S. 312; *Frei Art Glass Co.* v. *United States*, 15 Ct. Cust. Appls. 132, T. D. 42214; *Lazarus, Rosenfeld & Lehmann* v. *United States*, 2 Ct. Cust. Appls. 508, T. D. 32247. A distinction is made between what is done in a sculptor's studio by his own hand or under his eye and what is done by workmen in a marble shop. *Tutton* v. *Viti, supra.*

In accordance with that purpose, it has been held that reproductions made in large quantities in factories are not works of art. *Lazarus, Rosenfeld & Lehmann* v. *United States, supra*; *O. O. Friedlaender Co.* v. *United States, supra*; *A. N. Khouri & Bro.* v. *United States*, 1 Cust. Ct. 92, C. D. 27; *John P. Daleiden Co.* v. *United States*, 50 Treas. Dec. 679, Abstract 707.

In the instant case it appears that during 1949 Doulton produced an average of 15,254 figures a month; that the average production per week per artist was 20.1 figures; that the average number of persons trained to paint figures employed during 1949 was 176; that the average annual salary of such employees was £513 for males and £237 for females; that in some cases over 100 reproductions of a figure were made. The report of customs agent Simms (defendant's collective exhibit 25) shows that plaintiff usually carries a few dozen of each figure in stock, as high as 4 dozen of the popular figures and 1 or 2 dozen of the less popular ones. The record shows further that

retail establishments carry about six of each figure in stock and that they are billed, ordered, and cataloged by stock numbers.

From this, we conclude that these articles are not artistic productions of the type Congress intended by the words "works of art" but belong to the class of decorative arts, which was defined in *United States* v. *Perry*, 146 U. S. 71, as follows (p. 75):

> 2. Minor objects of art, intended also for ornamental purposes, such as statuettes, vases, plaques, drawings, etchings, and the thousand and one articles which pass under the general name of bric-a-brac, and *are susceptible of an indefinite reproduction from the original.* [Emphasis supplied.]

Plaintiff claims that the provision in paragraph 1547 (a), excluding sculptures valued at less than $2.50, denoted an intention by Congress to broaden the scope of the paragraph so as to include works of art not in the domain of the free fine arts or such works of art as were produced in commercial quantities. This contention has been answered in *The Friedlaender Co.* v. *United States*, 64 Treas. Dec. 247, T. D. 46637, where the court said (p. 254):

> From the foregoing statement it is clear that the conference committee considered the amendment as removing from the possibility of classification as works of art all sculptures and statuary, not specially provided for, which are valued at not less than $2.50 and relegated them to classification according to the component material of chief value, and not that it was liberalizing the term "works of art" nor in any manner reducing the standard for classification thereunder.

For the foregoing reasons, we hold that the merchandise herein is not classifiable as "statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50" under paragraph 1547 (a) of the Tariff Act of 1930, but is properly dutiable as found by the collector at 45 per centum ad valorem under paragraph 212, as modified by the trade agreement with the United Kingdom, T. D. 49753, on the china figures, and at 50 per centum ad valorem and 10 cents per dozen pieces under paragraph 211 on those made of earthenware. The protest is overruled and judgment will be rendered accordingly.